# United States Court of Appeals for the Federal Circuit

---

**SIOUX HONEY ASSOCIATION, ADEE HONEY FARMS,
MONTEREY MUSHROOMS, INC., THE GARLIC COMPANY,
AND RICELAND CRAWFISH, INC. (ALSO KNOW AS
BEAUCOUP CRAWFISH OF EUNICE, INC.),**
*Plaintiffs-Appellants,*

v.

**HARTFORD FIRE INSURANCE COMPANY,
HARTFORD ACCIDENT AND
INDEMNITY COMPANY, HARTFORD CASUALTY
INSURANCE COMPANY,
HARTFORD INSURANCE COMPANY OF ILLINOIS,
HARTFORD INSURANCE COMPANY OF THE
MIDWEST,
AND HARTFORD INSURANCE COMPANY OF THE
SOUTHEAST,**
*Defendants-Appellees,*

and

**AEGIS SECURITY INSURANCE COMPANY
AND LINCOLN GENERAL INSURANCE COMPANY,**
*Defendants-Appellees,*

and

**AMERICAN CONTRACTORS INDEMNITY
COMPANY,
AMERICAN HOME ASSURANCE COMPANY,**

AND **XL SPECIALTY INSURANCE COMPANY,**
*Defendants-Appellees,*

**and**

**GREAT AMERICAN ALLIANCE INSURANCE
COMPANY,
GREAT AMERICAN INSURANCE COMPANY,**
AND **GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK,**
*Defendants-Appellees,*

**and**

**INTERNATIONAL FIDELITY INSURANCE
COMPANY,**
*Defendant-Appellee,*

**and**

**WASHINGTON INTERNATIONAL INSURANCE
COMPANY,**
*Defendant-Appellee,*

**and**

**UNITED STATES, UNITED STATES CUSTOMS
AND BORDER PROTECTION,
JAYSON P. AHERN,** ACTING CUSTOMS COMMISSIONER,
**DEPARTMENT OF COMMERCE, AND GARY
LOCKE,** SECRETARY OF COMMERCE,
*Defendants-Appellees.*

———————————

2011-1040

———————————

Appeal from the United States Court of International
Trade in case no. 09-CV-0141, Judge Timothy C. Stanceu.

---

Decided:  February 7, 2012

---

PAUL C. ROSENTHAL, Kelley Drye & Warren LLP, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief were MICHAEL J. COURSEY and JOHN M. HERRMANN.  Of counsel on the brief were WILL E. LEONARD JR. and JOHN C. STEINBERGER, Adduci, Mastriani & Schaumberg, L.L.P., of Washington, DC.

JONATHAN F. COHN, Sidley Austin, LLP, of Washington, DC, argued for defendants-appellees The Hartford Fire Insurance Company et al.  With him on the brief were PETER D. KEISLER, NEIL R. ELLIS, LAWRENCE R. WALDERS, QUIN M. SORENSON and RYAN C. MORRIS.  Of counsel was ARTHUR K. PURCELL, Sandler, Travis & Rosenberg, P.A., of New York, New York.

MARY KAY VYSKOCIL, Simpson Thacher & Bartlett, LLP, of New York, New York, argued for remaining defendants-appellees with the exception of the United States, et al.  With her on the brief for Washington International Insurance Company were BARRY R. OSTRAGER and MICHAEL J. GARVEY.  Of counsel on the brief was GILBERT LEE SANDLER, Sandler, Travis & Rosenberg, P.A., of Miami, Florida.  On the brief for defendants-appellees American Contractors Indemnity Company, et al, were MARK F. HORNING and HERBERT C. SHELLEY, Steptoe & Johnson, LLP, of Washington, DC.  Of counsel was LAURA ROSE ARDITO.  Of counsel on the brief for defendants-appellees American Alliance Insurance Company, et al were MARK D. PLEVIN, THEODORE R. POSNER and

ALEXANDER H. SCHAEFER, Crowell & Moring, LLP, of Washington, DC.  On the brief for defendants-appellees International Fidelity Insurance Company, et al, were ARMEN SHAHINIAN and ADAM P. FRIEDMAN, Wolff & Samson, PC, of West Orange, New Jersey.  On the brief for defendants-appellees Aegis Security Insurance Company, et al, was T. RANDOLPH FERGUSON, Sandler, Travis & Rosenberg, P.A., of San Francisco, California.

L. MISHA PREHEIM, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees United States, et al.  With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and FRANKLIN E. WHITE, JR., Assistant Director.  Of counsel on the brief were JONATHAN M. ZIELINSKI, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC; ALBERT T. KUNDRAT and ANDREW G. JONES, Attorneys, Office of Assistant Chief Counsel, United States Customs and Border Protection, of Indianapolis, Indiana.

---

Before RADER, *Chief Judge*, LOURIE and PROST, *Circuit Judges.*

PROST, *Circuit Judge.*

Under federal trade law imported products are often assessed antidumping duties in an effort to prevent these products from undercutting the domestic market.  The Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"), which has since been repealed, directed the government to distribute collected duties to domestic producers harmed by dumping.  19 U.S.C. § 1675c(a) (2000).  In this case, Plaintiffs are domestic producers

seeking distributions under the CDSOA. Plaintiffs also attempt to compel the assessment and collection of additional antidumping duties. The United States Court of International Trade dismissed all of Plaintiffs' claims at the motion to dismiss stage. *See Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 700 F. Supp. 2d 1330 (Ct. Int'l Trade 2010); *Sioux Honey Ass'n v. United States*, 722 F. Supp. 2d 1342 (Ct. Int'l Trade 2010). We affirm-in-part and vacate-in-part. Additionally, we affirm the Court of International Trade's decision to deny Plaintiffs' motion for jurisdictional discovery.

## I. BACKGROUND

### A. Antidumping Statutory Scheme

Dumping occurs when a foreign company sells a product in the United States at a lower price than what it sells that same product for in its home market. Such a product can be described as being sold below "fair value." Dumping presents unfair competition concerns because foreign companies selling goods below fair value can undercut domestic producers selling those same goods at market prices. Congress attempted to offset the harmful effects of dumping by enacting the Tariff Act of 1930. This statute, in combination with other statutes and regulations, provides a complex framework for determining the extent to which an imported product is being dumped, and for calculating a duty rate that offsets the dumping.

Under the antidumping statutes, a domestic producer suspecting a foreign company of dumping can petition the Department of Commerce ("Commerce") for an investigation of that foreign company's merchandise. Additionally, Commerce itself may initiate such an investigation. In an investigation, Commerce analyzes the prices of the im-

ported goods and determines whether dumping occurred. 19 U.S.C. §§ 1671, 1673. The International Trade Commission ("ITC") conducts a parallel investigation to determine whether an industry in the United States suffers injury from the imports at issue. *Id.* If the final determinations of Commerce and the ITC are affirmative (i.e., if they conclude that dumping and injury occurred), Commerce issues an antidumping order ("AD order"), which publishes duty rates for the investigated products. *Id.* §§ 1671e, 1673e. The duty rates calculated by Commerce throughout the antidumping investigation are called "deposit rates."

The AD order also instructs United States Customs and Border Protection ("Customs") to collect cash deposits for merchandise subject to the order when that merchandise enters the country. The values of these deposits are based on the duty rates published in the order. Technically speaking, the duty rates published in the AD order are not the final, assessed rates. Rather, as explained below, rates are finalized later in the process. Therefore, the cash deposits collected upon entry are considered estimates of the duties that the importer will ultimately have to pay as opposed to payments of the actual duties.

Each year after an AD order issues, an interested party can request that Commerce conduct an administrative review of the order. In this review, Commerce analyzes the actual merchandise imported throughout the previous year that is subject to the order. (In some administrative reviews, Commerce analyzes the merchandise imported over the previous year and a half.) This system, often described as a retroactive system, enables Commerce to calculate a final duty rate based on the actual imports themselves as opposed to information obtained before importation even began. The final anti-

dumping duty rate obtained through the administrative review is called the liquidation rate. Commerce communicates this liquidation rate to Customs through "liquidation instructions," and Customs then instructs its staff at each port to assess final duties on all relevant entries. If the deposit rate (i.e., the estimated rate calculated during the antidumping investigation) is higher than the final liquidation rate, then the importer overpaid and is entitled to a refund. If the deposit rate equals the liquidation rate, then the importer's previous deposit satisfies its duty obligation. Notably, if no administrative review is requested, the deposit rate is generally used to assess the final duty.

Additionally, the antidumping statutes permit accelerated review for companies that ship the same type of product covered by a previously-issued antidumping duty order, but where that shipping occurs outside of the timeframe encompassed by order's period of review. Such companies are often called "new shippers," and this accelerated review program is called a "new shipper review." If a new shipper does not participate in a new shipper review, its merchandise will likely be subject to a predetermined deposit rate that applies generally to companies whose products were never individually investigated. These predetermined rates are often higher than the individual rates obtained through an investigation.

Like importers participating in an initial antidumping investigation, new shippers participating in a new shipper review must post a deposit intended to reflect the value of the antidumping duties that will ultimately be owed. 19 U.S.C. § 1675(a)(2)(B)(iii). For over eleven years (January 1, 1995 through April 1, 2006), new shippers were allowed to satisfy this deposit requirement by having a surety post a Customs bond in lieu of cash (also referred to as a

"new shipper bond"). *Id.* This bond posting process was (and still is) governed by contracts involving new shippers, sureties, and the government. These bond contracts are intertwined with the federal antidumping regime, as they incorporate numerous antidumping statutes and regulations by reference. In August 2006, however, Congress suspended the bonding option, thereby making cash deposits mandatory.

Finally, as mentioned, the antidumping statutes require Customs to distribute collected duties to domestic companies harmed by dumping. Specifically, in October 2000, Congress passed the Continued Dumping and Subsidy Offset Act, which provides that Customs "shall" distribute antidumping duties collected on imports to the "affected domestic producers." 19 U.S.C. § 1675c(a). While Congress repealed the CDSOA in 2005, it allowed for the continued distribution of duties assessed and collected before October 1, 2007. *See* Continued Dumping and Subsidy Offset Act of 2000, Pub.L. No. 106–387, § 1001–1003, 114 Stat. 1549, 1549A–72–75 (codified at 19 U.S.C. § 1675c (2000)), *repealed by* Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective Oct. 1, 2007).

## B. Plaintiffs' Allegations and the Court of International Trade Decision

Plaintiffs are domestic producers seeking distributions of antidumping duties under the CDSOA. They filed suit in 2009 against Customs and Commerce (collectively "Government"), as well as various sureties ("Surety Defendants"). As Plaintiffs allege in their Complaint, Customs has failed to collect millions of dollars of assessed antidumping duties in recent years. Plaintiffs assert that a large portion of these uncollected funds can

be traced back to Customs bonds posted in conjunction with new shipper reviews. Specifically, Plaintiffs contend that "all or virtually all" of the Customs bonds issued between January 1, 1995 and August 18, 2006 stem from a mere twenty AD orders—all involving Chinese imports ("the twenty Chinese Orders"). Compl. ¶¶ 3-4. Moreover, Plaintiffs allege that "the vast majority" of the Customs bonds issued within this timeframe relate back to AD orders on the following four products: fresh garlic, certain preserved mushrooms, freshwater crawfish tail meat, and pure honey ("the Four Orders"). *Id.* at ¶ 4. As Plaintiffs summarize, of the 174 new shipper reviews conducted between January 1, 1995 and August 18, 2006 under the twenty Chinese Orders, 107 were conducted under the Four Orders. *Id.*

Citing information from Customs' website, Plaintiffs represent in their Complaint that Customs has failed to collect $723 million of the $771 million in final AD duties assessed under the Four Orders over the past six years. *Id.* at ¶ 7. Plaintiffs then allege that most of these uncollected duties are owed by sureties who posted Customs bonds on behalf of new shippers. *Id.* Notably, Plaintiffs explain that substantially all imports from the twenty-seven importers participating in new shipper reviews under the Four Orders ceased after Congress suspended the new shipper bonding option.

This lawsuit involves numerous claims that, for the most part, fall into two categories. Regarding the first category of claims (i.e., Counts 1-7), Plaintiffs seek to enforce new shipper bond contracts as third-party beneficiaries. In asserting these claims, Plaintiffs sued the Government as well as various sureties that allegedly insured new shipper bonds. Regarding the second category of claims (i.e., Counts 8-15), Plaintiffs contend that

Customs and Commerce failed to satisfy a number of statutory and regulatory obligations, which prevented the collection and distribution of antidumping duties.

The Court of International Trade dismissed all fifteen of Plaintiffs' claims at the motion to dismiss stage. Specifically, the Court of International Trade dismissed Counts 2, 3, 4, and 6 for lack of standing and Counts 1 and 5 for failure to state a claim upon which relief can be granted. *See Sioux Honey*, 700 F. Supp. 2d at 1330. For the most part, these dismissals resulted from the Court of International Trade's conclusion that Plaintiffs failed to qualify as intended third-party beneficiaries of the bond contracts. The Court of International Trade also dismissed Counts 7, 8, 9, 13, and 14 for lack of subject matter jurisdiction and Counts 10, 11, 12, and 15 for failure to state a claim upon which relief can be granted. *See Sioux Honey*, 722 F. Supp. 2d at 1342. These claims were dismissed on standing, ripeness, or *Twombly* grounds. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Finally, the Court of International Trade denied Plaintiffs' motion for jurisdictional discovery. *See Sioux Honey*, 722 F. Supp. 2d at 1366-72.

Plaintiffs appealed from the Court of International Trade's judgment. We generally have jurisdiction to hear appeals from the Court of International Trade under 28 U.S.C. § 1295(a)(5). As explained below, however, we lack jurisdiction over some of the claims at issue.

## II. DISCUSSION

### A. Standard of Review and Claims at Issue on Appeal

We apply a de novo standard of review to both a trial court's dismissal for lack of jurisdiction and a trial court's

dismissal for failure to state a claim for which relief can be granted. *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1330-31 (Fed. Cir. 2008). We review a trial court's denial of a request for discovery for abuse of discretion. *Forest Prods. NW, Inc. v. United States*, 453 F.3d 1355, 1359 (Fed. Cir. 2006).

On appeal, Plaintiffs challenge the Court of International Trade's dismissal of four of the Complaint's six claims asserted against the Surety Defendants. These claims allege the following:

Count 1:    Plaintiffs are intended third-party beneficiaries of the bond contracts involving the importers, sureties, and Government;

Count 2:    The new shipper bonds were not voided by the CDSOA;

Count 3:    Surety Defendants breached their new shipper bond contracts involving the importers and Government;

Count 6:    Surety Defendants unlawfully compromised, modified, or discharged new shipper bonds owed under the bond contracts.

Plaintiffs also appeal from the Court of International Trade's dismissal of eleven of the Complaint's claims asserted against the Government, alleging the following:

Count 1:    Plaintiffs are intended third-party beneficiaries of the bond contracts involving the importers, sureties, and Government;

Count 2:    The new shipper bonds were not voided by the CDSOA;[1]

Count 6:    The Government unlawfully compromised, modified, or discharged new shipper bonds owed under the bond contracts;

Count 8:    Commerce failed to issue liquidation instructions to Customs, which resulted in uncollected antidumping duties;

Count 9:    Customs failed to assess final antidumping duties (i.e., it failed to execute the instructions it received from Commerce);

Count 10:   Customs failed to distribute collected duties to the domestic producers in accordance with the CDSOA;

Count 11:   Customs failed to issue letters to sureties demanding payment when importers missed duty payments;

Count 12:   Customs unlawfully compromised (i.e., settled) antidumping duties secured by new shipper bonds;

Count 13:   Customs unlawfully wrote off duties as uncollectable;

---

[1] There is confusion in the briefing regarding whether Plaintiffs appeal the Court of International Trade's dismissal of Counts 1 and 2 as asserted against the Government. We will treat these claims as being appealed.

Count 14:    Customs unlawfully cancelled new shipper bonds; and

Count 15:    Customs failed to provide the Department of Justice with notice letters when sureties did not meet payment obligations.[2]

For the reasons detailed below, Counts 1, 2, 3, and 6 as asserted against the Surety Defendants must be dismissed. We reach this conclusion, however, on grounds other than those relied on by the Court of International Trade. Specifically, while the Court of International Trade dismissed these claims on third-party beneficiary grounds, we do so for lack of jurisdiction.

As for the claims against the Government, dismissal is appropriate for:

Counts 1, 2, and 6 because Plaintiffs fail to qualify as intended third-party beneficiaries of the bond contracts;

Counts 11 and 13 because these claims challenge discretionary agency actions that are unreviewable in federal court under *Heckler v. Chaney*, 470 U.S. 821 (1985);

Counts 8-10, 12, and 15 because these claims fail to state a claim upon which relief can be granted under Twombly, 550 U.S. at 544; and

---

[2]    Plaintiffs did not appeal the Court of International Trade's dismissal of Counts 4, 5, and 7. 19 U.S.C. § 1671.

Count 14 because Plaintiffs conceded that this claim was filed in error.

We turn first to the Claims against the Surety Defendants, followed by the Claims against the Government.

## B. Claims Against the Surety Defendants

The Court of International Trade's jurisdiction lies primarily over claims asserted by or against the federal government. In the present case, however, the Court of International Trade exercised supplemental jurisdiction over claims asserted by private parties against other private parties (i.e., the claims asserted by Plaintiffs against the Surety Defendants), reasoning that 28 U.S.C. § 1585 permitted it to exercise this jurisdiction under 28 U.S.C. § 1367, the district court supplemental jurisdiction statute. *See Sioux Honey*, 700 F. Supp. 2d at 1345. As explained below, however, this conclusion is erroneous. We find that the Court of International Trade lacks jurisdiction to hear the claims at issue in this appeal asserted against the Surety Defendants (Counts 1, 2, 3, and 6).

### 1. Statutory Supplemental Jurisdiction

"[T]wo things are necessary to create jurisdiction . . . . The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it." *Mayor v. Cooper*, 73 U.S. 247, 252 (1867). "Courts created by statute can have no jurisdiction but such as the statute confers." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988). The Court of International Trade is a court created by statute. *See* Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727 (Oct. 10, 1980). It "operates within precise and narrow juris-

dictional limits" and "cannot exercise jurisdiction over actions not addressed by a specific jurisdictional grant." *Trayco, Inc. v. United States*, 994 F.2d 832, 836 (Fed. Cir. 1993).

The "jurisdictional limits" of the Court of International Trade are explicitly set forth in the Customs Courts Act. *See* 28 U.S.C. §§ 1581-1584. In particular, §§ 1581, 1582, and 1584 grant the Court of International Trade jurisdiction over specific types of claims mostly involving trade law that are asserted by or against the United States. It is undisputed that the claims against the Surety Defendants do not fall under any of these jurisdictional provisions.

The remaining jurisdictional provision in the Customs Courts Act, 28 U.S.C. § 1583, confers a form of supplemental jurisdiction on the Court of International Trade, namely jurisdiction over any "counterclaim, cross-claim, or third-party action" where the claim involves "imported merchandise that is the subject matter of [the original claims]" or a "recover[y] upon a bond or customs duties relating to such merchandise." The Court of International Trade concluded that § 1583 cannot provide jurisdiction over the claims against the Surety Defendants because Plaintiffs did "not bring[] a cross-claim or counterclaim, nor are they asserting a 'third party action,' which is in the nature of impleader." *See Sioux Honey*, 700 F. Supp. 2d at 1339 n.4. Plaintiffs do not dispute this conclusion on appeal. We agree that § 1583 does not vest the Court of International Trade with jurisdiction over the Surety Defendant claims. In sum, the Court of International Trade correctly concluded that "plaintiffs' claims against the Surety Defendants do not fall within any grant of original jurisdiction to the Court of International Trade."

*Id.* at 1339.  Indeed, Plaintiffs do not argue to the contrary.  *See id.*

As noted above, however, the Court of International Trade concluded that another provision in the Customs Courts Act, 28 U.S.C. § 1585, provided it with the authority to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the Surety Defendant claims.  *See Sioux Honey*, 700 F. Supp. 2d at 1345.  In particular, the Court of International Trade explained that § 1367's grant of supplemental jurisdiction to district courts was among "the powers in law and equity" conferred to the Court of International Trade under 28 U.S.C. § 1585.  *Id.* at 1343, 1345 (concluding that "§ 1585 and § 1367, when construed together and according to their respective purposes as revealed in the legislative history, confer upon the Court of International Trade the statutory form of supplemental jurisdiction" found in § 1367).  Put simply, the Court of International Trade construed the "power" term in § 1585 to include the concept of supplemental jurisdiction.  This conclusion, however, is flawed.

As an initial matter, "power" and "jurisdiction" are separate and distinct concepts, a characterization that weighs against construing power to subsume jurisdiction.  For example, we have stated that a "distinction exists between a court's subject matter jurisdiction and its inherent powers, i.e., those incidental powers necessary and proper to an exercise of that jurisdiction."  *Rhone Poulenc, Inc. v. United States*, 880 F.2d 401, 402 (Fed. Cir. 1989).  "Subject matter jurisdiction" refers to the class of cases that the court is authorized to hear.  *Id.* at 402-03.  "Power" refers to the court's ability, when it has subject matter jurisdiction, to grant equitable and legal relief to a party.  *Id.*  Even the Court of International Trade has previously stated that § 1585 "relates only to the powers

of the Court to render an effective judgment once jurisdiction is established." *Star Sales & Distrib. Corp. v. United States*, 663 F. Supp. 1127, 1130 (Ct. Int'l Trade 1986). Thus, a court's power to grant relief is not synonymous with its ability to exercise jurisdiction, as these two concepts are separate and distinct. Power does not necessarily envelop the concept of jurisdiction.

Further, that § 1585 does not contain a "jurisdiction" term is telling, especially because the Customs Courts Act *does* refer to "jurisdiction" numerous times in neighboring provisions (i.e., §§ 1581-1584). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). Congress's use of the term "jurisdiction" in §§ 1581-1584 but not in § 1585 suggests that it did not intend for the "powers" term in § 1585 to incorporate the concept of supplemental jurisdiction.

Moreover, reading § 1585 to provide a grant of supplemental jurisdiction would render another provision in the Customs Courts Act superfluous. As mentioned, 28 U.S.C. § 1583 confers a form of supplemental jurisdiction on the Court of International Trade, namely jurisdiction over counterclaims, cross-claims, or third-party actions involving specific subject matter. Allowing § 1585 to incorporate supplemental jurisdiction would provide the Court of International Trade with all the authorities granted in § 1583, thereby rendering § 1583 meaningless. Indeed, "one of the most basic interpretive canons" is "that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v.*

*United States*, 129 S. Ct. 1558, 1566 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1362 (Fed. Cir. 2000) ("It is a long-held tenet of statutory interpretation that one section of a law should not be interpreted so as to render another section meaningless."). The fact that the Court of International Trade's construction of the "powers" term in § 1585 would render § 1583 meaningless provides another justification for rejecting this construction. For the above reasons, we conclude that the "powers" term of 28 U.S.C. § 1585 cannot be construed to provide the Court of International Trade with authority to exercise 28 U.S.C. § 1367 supplemental jurisdiction over Plaintiffs' claims against the Surety Defendants.

Notably, the Court of International Trade relied heavily on legislative history in concluding that § 1585 and § 1367 combine to provide it with supplemental jurisdictional authority over the Surety Defendant claims. For example, the Court of International Trade emphasized the following language from the Customs Courts Act's House Report:

> Proposed Section 1585 provides that the Court of International Trade shall possess all the powers in law and equity of, or conferred by statute upon, a district court. In the past, there has been some doubt as to whether or not the Customs Court possessed this *full judicial authority*. It is the Committee's intent to make clear that the Customs Court's successor, the United States Court of International Trade, does possess the same plenary powers as a federal court [sic] district court.

*Sioux Honey*, 700 F. Supp. 2d at 1341 (quoting H.R. Rep. No. 96-1235, at 50 (1980), *reprinted in* 1980 U.S.C.C.A.N.

3729, 3762). The Court of International Trade viewed the use of the terms "full judicial authority" and "plenary powers" as "strongly counsel[ing] against a narrow reading of § 1585 under which the provision is confined in scope to remedial powers in law and equity." *Id.* at 1342.

We disagree with the Court of International Trade's analysis of the Customs Courts Act's House Report and believe that the Report just as readily supports a conclusion that the Court of International Trade lacks authority to exercise supplemental jurisdiction over the Surety Defendant claims. As evident in the Report, a main purpose of the Customs Courts Act was to eliminate the "inconsistent judicial decisions" and "jurisdictional conflicts" resulting from district courts hearing some trade cases, and the Customs Court (the predecessor court to the Court of International Trade) hearing others. H.R. Rep. No. 96-1235, at 19-20, *reprinted in* 1980 U.S.C.C.A.N. at 3731. These inconsistencies and conflicts arose in part because the district courts had significantly greater remedial powers than the Customs Court. Indeed, "the Customs Court's remedial powers [were] generally limited to agreeing or disagreeing with the final determination of an administrative agency." *Id.* at 21, *reprinted in* 1980 U.S.C.C.A.N. at 3733.

To solve this problem, the jurisdictional provisions mentioned earlier (§§ 1581-1584 of Title 28) were drawn to "defin[e] the demarcation between the jurisdiction of the Court of International Trade and the federal district courts." H.R. Rep. No. 96-1235, at 30, *reprinted in* 1980 U.S.C.C.A.N. at 3741. Then, through § 1585, Congress conferred upon the Court of International Trade powers to grant relief in the cases before it that far exceeded the Customs Court's prior authority. Thus, the Report illustrates how "power" and "jurisdiction" were incorporated

separately into the Customs Courts Act, with the power concept being embedded in § 1585 and the jurisdiction concept being embodied in §§ 1581-1584. For these reasons, we believe the House Report, if anything, supports the conclusion that the "powers" term in § 1585 does not subsume the concept of supplemental jurisdiction. Thus, we disagree with the Court of International Trade's conclusion to the contrary.

Additionally, no grant of supplemental jurisdictional authority to the Court of International Trade can be found in 28 U.S.C. § 1367 itself. Indeed, this provision only confers jurisdiction on the "district courts." Congress expressly defined "district court" to mean "the courts constituted by chapter 5" of Title 28. *See* 28 U.S.C. § 451; *Id.* §§ 81-144 (establishing trial courts in fifty states and the District of Columbia). The Court of International Trade, however, is constituted by chapter 11 of Title 28. Therefore, the Court of International Trade is not a "district court" and cannot benefit from § 1367. This conclusion is reinforced by the fact that Title 28 repeatedly treats district courts and the Court of International Trade as separate and exclusive entities. *See, e.g., id.* § 451 (referring to "district courts" and "the Court of International Trade" separately in the definitions of "court of the United States" and "judge of the United States").

The Court of International Trade relied on the legislative history associated with 28 U.S.C. § 1367 to support its conclusion that it had authority to exercise statutory supplemental jurisdiction. *See Sioux Honey*, 700 F. Supp. 2d at 1345. This legislative history states that "[l]egislation . . . is needed to provide the federal courts with statutory authority to hear supplemental claims." H.R. Rep. No. 101-734 (1990), at 28, *reprinted in* 1990

U.S.C.C.A.N. 6860, 6874. As explained above, however, § 1367's grant of supplemental jurisdiction authority was clearly confined to district courts. Therefore, we decline to adopt the Court of International Trade's reasoning regarding this issue.

In sum, in relying so heavily on legislative history, the Court of International Trade failed to properly consider the statutory language of 28 U.S.C. § 1367 and §§ 1581-1585. Nothing in these statutes, when viewed in combination or individually, provides a specific grant of supplemental jurisdictional authority to the Court of International Trade over the types of claims asserted against the Surety Defendants. *See Christianson*, 486 U.S. at 818 ("Courts created by statute can have no jurisdiction but such as the statute confers."). For these reasons, we conclude that the Court of International Trade erred in exercising statutory jurisdiction over the Surety Defendant claims (Claims 1, 2, 3, and 6) under § 1585 and § 1367.

## 2. Common Law Pendent Jurisdiction

On appeal, as they did below, Plaintiffs assert that even if the Court of International Trade cannot exercise statutory supplemental jurisdiction over the claims against the Surety Defendants under § 1585 and § 1367, it can exercise non-statutory, common law pendent jurisdiction over those claims. Pendent jurisdiction involves a court's ability to hear a claim "for which there is no independent basis for federal jurisdiction, but that arises out of a 'common nucleus of operative fact' with a properly asserted claim that does fall within the federal court's subject matter jurisdiction." 16 J. Moore et al., *Moore's Federal Practice* § 106.03[2], pp. 106-11 (3d ed. 2011). Pendent jurisdiction has two primary components: pen-

dent-claim jurisdiction and pendent-party jurisdiction. Pendent-claim jurisdiction principles apply in a federal lawsuit involving one plaintiff versus one defendant, where an independent jurisdictional basis exists for one of the claims at issue between the parties, but not for a second state law claim. *See id.* § 106.03[3]. Pendent-party jurisdiction principles, on the other hand, apply if the plaintiff in the previous example asserts that second state law claim against a third party not named in another claim independently cognizable by the federal court. *See id.* Thus, pendent-party jurisdiction is often described as involving the exercise of pendent jurisdiction over *parties*, as opposed to claims between parties already before the court through an independently cognizable federal claim.

The seminal Supreme Court case discussing the concept of pendent-claim jurisdiction is *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). There, the plaintiff asserted the following claims against the same defendant: (1) a claim based on a federal statute and (2) a state law claim grounded in Tennessee common law. *Id.* at 720-21. The Court held that the district court did not err in exercising jurisdiction over the state law claim, reasoning that a federal court can hear a state law claim if it derives from the same "common nucleus of operative fact" as the federal claim. *Id.* at 725, 729. The Supreme Court also explained, however, that even if a district court has the authority to invoke the doctrine of pendent jurisdiction, "[t]hat power need not be exercised" because "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726.

The Supreme Court addressed the concept of pendent-*party* jurisdiction in *Finley v. United States*, 490 U.S. 545 (1989). In that case, the plaintiff filed a federal claim

against the federal government along with state law claims against a local, nonfederal utility company. *Id.* at 546. The Court held that no jurisdiction existed over the state law claims asserted against the utility company. *Id.* at 556. In reaching this conclusion, the Court explained that the *Finley* state law claims "fundamentally differ[ed]" from the state law claim in *Gibbs* because exercising jurisdiction over the *Finley* claims would require adding a party to the suit. *Id.* at 549; *see also id.* at 551 ("The most significant element of 'posture' or of 'context' in the present case . . . is precisely that the added claims involve added parties over whom no independent basis of jurisdiction exists." (citation omitted)); *id.* at 556 ("All our cases . . . have held that a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties."). Indeed, in *Gibbs*, the parties implicated by the state law claim were already before the court through an "independently cognizable" federal claim. *See id.* at 549.[3]

The Court of International Trade, applying *Finley*, concluded that it lacked authority to exercise "'common law' supplemental jurisdiction" over the Surety Defendant claims. *Sioux Honey*, 700 F. Supp. 2d at 1340. We agree. As explained above, the Court of International Trade has no original jurisdiction over any of the claims against the Surety Defendants. We also concluded that no statutory supplemental jurisdiction exists in this case. Therefore, absent pendent jurisdiction, the Surety Defendants would

---

[3]     The Court in *Finley* acknowledged that its finding of no jurisdiction over the state law claims "mean[t] that the efficiency and convenience of a consolidated action [would] sometimes have to be forgone in favor of separate actions in state and federal courts." *Id.* at 555. This concern, however, did not compel the Court to exercise jurisdiction over the state law claims. *Id.*

drop entirely from the suit. Thus, pendent-party jurisdiction is at issue in this case—not pendent-claim jurisdiction, and *Finley* controls.

*Finley* clearly bars the type of procedural maneuver that Plaintiffs attempt in this case (i.e., bringing additional parties into a lawsuit through claims not independently cognizable in federal court). Following *Finley*, we conclude that the Court of International Trade does not possess common law, pendent jurisdiction over the Surety Defendant claims at issue in this appeal (Claims 1, 2, 3, and 6). Some statutory grant of authority is required, which, as stated above, does not exist in this case. Because jurisdiction is lacking over the Surety Defendant claims at issue in this appeal, these claims must be dismissed.

## C. Claims Against the Government

In light of our conclusion that the Court of International Trade lacks jurisdiction over the claims asserted against the Surety Defendants, all that remains for resolution are the claims raised on appeal that have been asserted against the Government (i.e., Counts 1, 2, 6, and 8-15). Of these claims, Counts 1, 2, and 6 must fail because Plaintiffs do not qualify as intended third-party beneficiaries. We explain why below in Subsection 1. Counts 8-15 fail for the reasons discussed below in Subsection 2.

### 1. Claims Involving Third-Party Beneficiary Status

As mentioned above, during the time period at issue in this lawsuit, a new shipper was permitted to satisfy its duty deposit requirement by posting a Customs bond equal in value to the cash deposit otherwise required. As

part of this process, sureties entered into contracts with importers to insure payment of deposits. Plaintiffs target these bond contracts in Counts 1, 2, and 6, arguing that they have a right to enforce the contracts as third-party beneficiaries. The Court of International Trade found otherwise, dismissing Counts 1, 2, and 6 after concluding that Plaintiffs did not qualify as intended third-party beneficiaries. *Sioux Honey*, 700 F. Supp. 2d at 1348. We agree with the Court of International Trade.

A plaintiff lacking privity of contract can nonetheless sue for damages under that contract if it qualifies as an intended third-party beneficiary. *See Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005); *Alpine Cnty., Cal. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005); *Chancellor Manor v. United States*, 331 F.3d 891, 901 (Fed. Cir. 2003). "In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly*." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (emphasis added). "The intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status." *Flexfab*, 424 F.3d at 1259; *see also Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 131 S.Ct. 1342, 1347 (2011) ("A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend."). A party does not obtain third-party beneficiary status, however, "merely because the contract would benefit them." *FDIC v. United States*, 342 F.3d 1313, 1319 (Fed. Cir. 2003). Indeed, third-party beneficiary status is an "exceptional privilege" and "should not be granted liberally." *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912); *Flexfab*, 424 F.3d at 1259.

That said, "[t]he intended beneficiary need not be specifically or individually identified in the contract." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). If not identified, however, the nonparty must still "fall within a class clearly intended to be benefited thereby." *Id.* "When the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced." *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001).

Under our precedent, Plaintiffs (i.e., domestic producers) cannot qualify as intended third-party beneficiaries of the new shipper bond contracts. First, the contract language itself clearly treats the Government as the sole beneficiary. In particular, the language states that the importers and sureties agreed to "bind" themselves "to the United States in the amount or amounts, as set forth below." The contracts also incorporate federal regulations indicating that the Government is the beneficiary. *See, e.g.*, 19 C.F.R. § 113.62 (requiring "principal and surety, jointly and severally" to "[p]ay, as demanded by Customs, all additional duties, taxes, and charges subsequently found due . . . on any entry secured by [a] bond"). Plaintiffs do not argue to the contrary, acknowledging that each new shipper bond "is a contract among an importer (the bond's principal and primary obligor); the issuing surety (the bond's secondary obligor); and Customs (the bond's sole identified beneficiary)." The contracts do not identify the domestic producers as beneficiaries, also a conclusion Plaintiffs do not dispute.

The bond contracts' (1) treatment of the Government as a beneficiary; (2) failure to identify the domestic producers as beneficiaries; and (3) failure to mention a class of third parties that could potentially encompass the domestic producers, *see Montana*, 124 F.3d at 1273, all

combine to strongly support the conclusion that these contracts do not "reflect[] an intention to benefit" the domestic producers "directly." *See Glass*, 258 F.3d at 1354. Instead, any benefit the domestic producers may derive from the bond contracts would come indirectly through the application of the CDSOA. The mere fact that the domestic producers stand to ultimately benefit from the bond contracts in some capacity does not automatically render them intended third-party beneficiaries. *See, e.g.*, *FDIC*, 342 F.3d at 1319. The intended benefit must be direct. *See Glass*, 258 F.3d at 1354.

Plaintiffs argue on appeal that they are intended third-party beneficiaries because the new shipper bond contracts are essential to achieving the antidumping statute's purpose of collecting duties, which are then redistributed to domestic producers under the CDSOA. According to Plaintiffs, the importers, Surety Defendants, and the Government knew the contracts they were involved in would operate within the CDSOA framework and that the domestic producers would benefit directly from the contracts. *See Montana*, 124 F.3d at 1273 ("The intended beneficiary need not be specifically or individually identified in the contract" and can merely "fall within a class clearly intended to be benefited thereby."). As a result, contend Plaintiffs, the intent of the contracting parties to directly benefit the domestic producers exists. In further support of its position, Plaintiffs rely on *Roedler*, 255 F.3d at 1352, which states that when a contract involving the United States "implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose" when performing the third-party beneficiary analysis.

Following the Supreme Court's recent guidance in *Astra*, we reject Plaintiffs' contentions. In *Astra*, a program

created by a federal statute imposed limits on prices that drug manufacturers could charge healthcare facilities for medications. 131 S.Ct. at 1345. Drug manufacturers wishing to participate in state Medicaid systems had to enroll in this federal program. *Id.* To enroll, the drug manufacturers signed "form" contracts with the Department of Health and Human Services ("HHS") that "simply incorporate[d] statutory obligations." *Id.* at 1348. One statutory provision in the federal program provided for compensation to healthcare facilities overcharged by the drug manufacturers. *Id.* at 1347. Some healthcare facilities, believing they were overcharged for drugs, sued drug manufacturers under this federal statutory scheme. *Id.* Specifically, the healthcare facilities alleged that the overcharging constituted a breach of the manufacturers' enrollment contracts and that the facilities, as third-party beneficiaries of those contracts, could recover damages.[4] *Id.* at 1347

Despite acknowledging that the enrollment contracts specifically named the healthcare facilities as recipients of the drugs and that the very purpose of these agreements was to ensure that these facilities were not overcharged, the Supreme Court declined to accord the plaintiffs intended third-party beneficiary status. *Id.* at 1347-48. Instead, the Court held that suits filed by the statutorily-protected healthcare facilities to enforce the enrollment contracts were "incompatible with the statutory regime." *Id.* at 1345. In reaching this conclusion, the Court emphasized that Congress placed the Secretary of HHS in

---

[4] The healthcare facilities initiated this lawsuit despite the fact that the federal program at issue granted HHS the authority to oversee compliance with the drug pricing system; it did not provide the healthcare facilities with a private right of action. *Id.* at 1345.

control of the drug pricing scheme, not the healthcare facilities. *Id.* "[HHS's] control could not be maintained were potentially thousands of [healthcare facilities] permitted to bring suits alleging errors in manufacturers' price calculations." *Id.* "If [the healthcare facilities] may not sue under the statute, it would make scant sense to allow them to sue on a form contract implementing the statute, setting out terms identical to those contained in the statute." *Id.* Indeed, the Court reasoned that "[t]he absence of a private right to enforce . . . would be rendered meaningless if [the healthcare facilities] could overcome that obstacle by suing . . . instead." *Id.* at 1348. Under *Astra*, the fact that a private entity stands to benefit financially from a statutory scheme does not necessarily make it an intended third-party beneficiary of contracts operating within that scheme where no statutory private right of action exists.

The present case is factually similar to *Astra*. First, both cases involve complex statutory schemes that offer the plaintiffs the potential of obtaining a financial benefit. Moreover, like the plaintiffs in *Astra*, Plaintiffs in this case attempt to recover under a contract intertwined with that statutory scheme, claiming intended third-party beneficiary status. Additionally, the contracts at issue in both cases are governed by federal laws. Perhaps most importantly, the statutes governing the contracts at issue in both cases do not grant the plaintiffs the right to bring a private lawsuit to recover the fees allegedly owed to them. *See id.* at 1347. Indeed, in the present matter, Congress vested the Government with the authority to enforce the Customs bond contracts, not the domestic producers. *See* 19 U.S.C. § 1623(a)-(c) (authorizing "the Secretary of the Treasury" or "the Customs Service" to enforce Customs bonds); *see also id.* § 1514(a)-(b) (after Customs makes a payment demand on the surety, the

surety must either pay Customs or file an administrative protest with Customs which, if denied, may be challenged in the Court of International Trade). In a situation such as this, where no statutory private right to enforce the Customs bonds exists, permitting a party to sue as an intended third-party beneficiary would improperly render "[t]he absence of [that] private right . . . meaningless." *See Astra*, 131 S.Ct. at 1348.

In sum, while the bond contracts treat the Government as a direct beneficiary, the same cannot be said of the domestic producers or a class that encompasses the domestic producers. This conclusion is supported by the fact that the antidumping statutes do not confer private enforcement rights on the domestic producers under the bond contracts. Any benefit the domestic producers derive from the bond contracts comes *indirectly* as a result of the operation of the CDSOA. Because Plaintiffs are not intended third-party beneficiaries of the bond contracts, they cannot enforce these contracts. Thus, we affirm the Court of International Trade's dismissal of Counts 1, 2, and 6 as asserted against the Government.

## 2. Remaining Claims

After our rulings on the supplemental jurisdiction and third-party beneficiary matters, only Counts 8-15 remain at issue in this appeal. As mentioned, these claims, which primarily accuse Commerce and Customs of failing to satisfy statutory and regulatory obligations, were dismissed below on standing, ripeness, or *Twombly* grounds. Dismissal of these claims is appropriate. First, we conclude that Counts 11 and 13 must fail because they involve discretionary agency actions, which are unreviewable in federal court under *Heckler*, 470 U.S. at 821. Next, we find that Counts 8-10, 12 and 15 fail to state a

claim upon which relief can be granted because the Complaint lacks the factual matter necessary to satisfy the pleading requirements set forth in *Twombly*, 550 U.S. at 544. Finally, given an admission by Plaintiffs, Count 14 must also fail.[5]

On appeal, the Government argues that the Court of International Trade properly dismissed Claims 11 and 13 because these claims involve discretionary agency actions not subject to judicial review under *Heckler*. Plaintiffs respond by contending that the actions addressed in Claims 11 and 13 are required and ministerial, as opposed to discretionary, and are thus not protected by *Heckler*. We agree with the Government.[6]

In *Heckler*, the Supreme Court addressed "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 501 *et. seq.*" 470 U.S. at

---

[5]    Regarding Count 14, Customs is authorized under 19 U.S.C. § 1623(c) to cancel a bond upon a breach of the bond contract. According to Plaintiffs, "Congress amended Section 1623(c) in 1988 to require Customs to issue guidelines under which it would exercise its Section 1623(c) bond cancellation authority." Compl. ¶ 217. In Count 14, Plaintiffs allege that Customs failed to issue those guidelines. Customs, however, did issue guidelines pursuant to 19 U.S.C. § 1623(c). *See Customs Bond Cancellation Standards*, 54 Fed. Reg. 16,182 (Customs Apr. 21, 1989); *Guidelines to the Cancellation of Certain Claims for Liquidated Damages*, 67 Fed. Reg. 19,485 (Customs Apr. 19, 2002). Plaintiffs now admit that they filed Count 14 in error. For these reasons, we affirm the Court of International Trade's dismissal of Count 14.

[6]    *Heckler* applies in this case because Plaintiffs seek review under the Administrative Procedure Act.

823. The plaintiffs, prison inmates sentenced to death by lethal injection, alleged that the use of particular drugs for capital punishment violated certain provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"). They requested that the Food and Drug Administration ("FDA") take various enforcement actions to prevent the alleged violations, including affixing warnings on drugs and instructing prison administrators not to use the drugs for execution purposes. *Id.* at 823-24. The FDCA, however, contained no provisions requiring the FDA to take any of the actions requested by the plaintiffs. *Id.* at 835. Instead, "[t]he Act's enforcement provisions . . . commit[ed] complete discretion to the Secretary to decide how and when they should be exercised." *Id.*

The Court explained that in situations where an agency invokes its discretion to refuse to take enforcement steps, "the presumption is that judicial review is not available." *Id.* at 831. The Court provided the following basis for this presumption:

> First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the

proper ordering of its priorities. . . . In addition to these administrative concerns, we note that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers.

*Id.* at 831-32 (citations omitted).

The presumption that judicial review is not available "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832-33. Indeed, "in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers." *Id.* at 833. In *Heckler*, however, the Supreme Court concluded that the FDCA's enforcement provisions, which committed complete discretion to the Secretary, were insufficient to overcome the presumption. *Id.* at 835, 837. Therefore, the Court held that "[t]he FDA's decision not to take the enforcement actions requested by respondents [was] . . . not subject to judicial review under the APA." *Id.* at 837-38.

Notably, the Supreme Court in *Heckler* discussed *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), a case where the petitioners sought to prevent construction of an interstate highway through a park in Tennessee. *Id.* at 406-07. The federal statute at issue in

*Overton Park* provided that the Secretary "shall not approve" any program or project using public parkland if a "feasible and prudent" alternative route exists. *Id.* at 405. The Court found that the petitioners, who argued that this statute prohibited the Secretary from authorizing construction of the road, were entitled to judicial review because "the Secretary's decision . . . d[id] not fall within the [APA's] exception for action 'committed to agency discretion.'" *Id.* at 410. Indeed, "[t]his is a very narrow exception." *Id.*

> *Heckler* distinguished *Overton Park*, explaining that
>
> *Overton Park* did not involve an agency's refusal to take requested enforcement action. It involved an affirmative act of approval under a statute that set clear guidelines for determining when such approval should be given. Refusals to take enforcement steps generally involve precisely the opposite situation, and in that situation we think the presumption is that judicial review is not available.

*Heckler*, 470 U.S. at 831.

In Counts 11 and 13, Plaintiffs allege that Customs failed to issue demand letters to sureties when importers missed duty payments (Count 11) and unlawfully wrote off duties as uncollectable (Count 13). As the Government points out, however, Plaintiffs fail to identify any law *requiring* Customs to issue a demand letter to a surety within a particular period of time. We are aware of no such law. Plaintiffs also fail to identify a law prohibiting Customs from writing off a debt. Once again, we are aware of no such law. In other words, Customs has discretion when deciding whether to engage in the con-

duct described in Counts 11 and 13. That Customs has this discretion makes sense, since this agency is in the best position to decide whether to devote federal resources towards obtaining relief from sureties, or whether such efforts would be wasteful. Because Customs possesses the discretion to perform the agency actions described in Counts 11 and 13, these claims fail under *Heckler*.

With regard to the remaining claims, we conclude that *Heckler* does not apply to preclude judicial review of Counts 8-10, and 15 because these counts allege discrete agency actions (or failures to take discrete agency actions) that either Customs or Commerce was required to take. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (A plaintiff attempting to challenge an agency's failure to act under the Administrative Procedure Act can only do so in federal court if that failure to act involves "a *discrete* agency action that [the agency] is *required to take*."). Therefore, we find that Plaintiffs have standing to assert these claims.

Regarding Count 12, the Government argues that Plaintiffs cannot succeed under this claim for the same reasons that Counts 1, 2, and 6 fail: because Plaintiffs do not qualify as intended third-party beneficiaries. Unlike Counts 1, 2, and 6, however, Count 12 does not simply involve an attempt to enforce the bond contracts. Instead, Plaintiffs accuse Customs in Count 12 of acting outside of its statutory authority by cancelling antidumping duties associated with bond contracts, contending that Commerce rather than Customs has this authority. Plaintiffs' failure to qualify as intended third-party beneficiaries does not prevent them from making this type of challenge. Moreover, the fact that Count 12 accuses Customs of *acting* without authorization, as opposed to *failing to act* when required by law, means that the presumption of no

judicial review discussed in *Heckler* does not apply to this claim.  For these reasons, we find that jurisdiction exists over Count 12.

As explained below, however, we conclude that Counts 8-10, 12, and 15 must be dismissed because they fail to state a claim upon which relief can be granted under *Twombly*, 550 U.S. at 544.  In Count 8, Plaintiffs allege that Commerce failed to issue liquidation instructions to Customs, which resulted in uncollected antidumping duties.  In Counts 9, 10, 12 and 15, Plaintiffs target Customs, not Commerce, asserting that Customs: (1) failed to assess final antidumping duties (Count 9); (2) failed to distribute collected duties to the domestic producers in accordance with the CDSOA (Count 10); (3) unlawfully compromised, or settled, antidumping duties secured by new shipper bonds (Count 12); and (4) failed to provide the Department of Justice with notice letters when sureties did not meet payment obligations (Count 15).

The Government argues on appeal that Plaintiffs' Complaint is devoid of facts and cannot satisfy the pleading requirements set forth in *Twombly*.  In response, Plaintiffs contend that their Complaint does contain factual detail sufficient to meet the thresholds of Court of International Trade Rule 8 and *Twombly*.  Additionally, Plaintiffs assert that the Court of International Trade parsed each count of the Complaint individually, failing to properly consider the counts within the context of the antidumping duty assessment and collection process.  We agree with the Government and conclude that dismissal of Counts 8-10, 12, and 15 under *Twombly* is appropriate because Plaintiffs failed to allege any specific instances

where Commerce and Customs actually committed the harms alleged in these claims.[7]

Under Court of International Trade Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to the relief." The Supreme Court explained in *Twombly* that while Rule 8 does not require "detailed factual allegations," it does require more than "labels and conclusions." *Twombly*, 550 U.S. at 555. Indeed, "a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting

---

[7] The Government argues that Plaintiffs lack standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), to assert their claims because they have not provided any concrete factual instances showing that Commerce or Customs actually engaged in the allegedly harmful conduct listed in the Counts of the Complaint. We view this argument as one invoking the merits of the case as opposed to a threshold standing argument. As a result, following *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010), we elect to address the Government's argument under Court of International Trade Rule 12(b)(5) (the equivalent to Fed. R. Civ. P. 12(b)(6)), rather than Court of International Trade Rule 12(b)(1) (the equivalent to Fed. R. Civ. P. 12(b)(1)). *See Morrison*, 130 S.Ct. at 2877 (explaining that appellate court erred by addressing "merits question" under Rule 12(b)(1) instead of Rule 12(b)(6), but declining to remand because "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion").

*Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see Twombly*, 550 U.S. at 557-58 ("something beyond the mere possibility . . . must be alleged"). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

In Claims 8-10, 12, and 15, Plaintiffs allege that Commerce and Customs failed to take various actions required by law involving the assessment, collection, and distribution of antidumping duties, and that these failures resulted in uncollected and undistributed duties. In support of its claims, Plaintiffs rely on public information published by Customs on its website indicating that Customs has failed to collect $723 million in final, assessed antidumping duties under the Four Orders over a six-year period. Thus, Plaintiffs' cause of action relies largely on the connection, if any, between (1) the alleged failure to follow the antidumping statutes and regulations and (2) the uncollected duties reported on Customs' website. Plaintiffs assert that given the substantial amount of uncollected duties, it is plausible to conclude and reasonable to infer that Commerce and Customs did not perform the statutory and regulatory obligations listed in Counts 8, 9, 12, and 15. According to Plaintiffs, it necessarily follows, then, that had the duties been collected they could have been distributed to the domestic producers under the CDSOA (*see* Count 10).

While Plaintiffs state that Customs failed to collect over $700 million in duties, their Complaint warrants dismissal because it contains no facts indicating that the conduct alleged in Counts 8-10, 12, and 15 actually occurred and caused the duties to be uncollected and undistributed. Indeed, Plaintiffs do not provide a single factual instance in their Complaint showing that Commerce failed to issue liquidation instructions to Customs when it was required to do so (Count 8) or that Customs: (1) failed to assess final antidumping duties when it was required to do so (Count 9); (2) failed to distribute collected duties to the domestic producers in accordance with the CDSOA when it was required to do so (Count 10); (3) unlawfully compromised, or settled, antidumping duties secured by new shipper bonds (Count 12); or (4) failed to provide the Department of Justice with a notice letter when it was required to do so (Count 15).

While it is *possible* that Commerce and Customs engaged in the actions (or inactions) outlined in Claims 8-10, 12, and 15, and that this activity (or inactivity) resulted in a failure to collect and distribute the duties, Plaintiffs have not provided enough factual detail in the Complaint to render these conclusions *plausible*. *See Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 570. Indeed, other scenarios not relating to Commerce or Customs' conduct could explain why Customs has not yet collected the $723 million. For example, the importers or sureties responsible for paying the duties could have gone out of business or declared bankruptcy. Furthermore, as the Government represented at oral argument, certain duties could be currently uncollected because they are subject to protests or pending collection actions. *See* Oral Arg. at 20:32-20:56, available at http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1040/all. In providing so few facts in

support of their allegations, Plaintiffs have done nothing to separate the conduct alleged in Counts 8-10, 12 and 15 from a whole host of other possible alternatives. *See Iqbal*, 129 S.Ct. at 1951 (considering the existence of "more likely" explanations in finding that a claim lacked plausibility). For these reasons, we conclude that Plaintiffs have failed to "nudge" Counts 8-13 and 15 "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570. Therefore, these claims must be dismissed.

Notably, as the Supreme Court explained in *Twombly*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 558. This rule rings especially true in the present case given the Government's obligation to compile an administrative record. Counts 8-10, 12, and 15 implicate virtually every meaningful step of the antidumping duty collection and distribution process and span a period of six years. The lack of factual specificity in these claims leaves the Government lost at sea when attempting to compile an administrative record. This further supports dismissal under *Twombly*.

Plaintiffs argue that they cannot plead with more specificity because the facts necessary to make such a pleading are in the possession of the Government and are thus unattainable. We reject this argument. Plaintiffs' assertion is undermined by the fact that the record provides no indication that they made an effort to obtain the information from the Government that they now claim is unattainable (either through a Freedom of Information Act request or by simply calling or writing Commerce or

Customs for information).[8]  To be sure, this is not to say
that Plaintiffs were required to file Freedom of Informa-
tion Act requests or call Commerce and Customs in order
to satisfy the *Twombly* standard.  These examples simply
highlight the fact that nothing in the record shows that
Plaintiffs made an attempt to obtain the information that
they now claim is "unavailable."

## D.  Motion for Jurisdictional Discovery

In the Court of International Trade proceedings,
Plaintiffs moved for permission to take jurisdictional
discovery.  As mentioned, the Court of International
Trade denied this motion, concluding that each claim was
dismissed for reasons that could not be remedied by
discovery.  We find that the Court of International Trade
did not abuse its discretion in denying the motion.

## III.  CONCLUSION

For the foregoing reasons, Counts 1, 2, 3, and 6 as as-
serted against the Surety Defendants must be dismissed
for lack of jurisdiction.  Regarding Count 1, the Court of
International Trade dismissed this claim on the merits for
failure to state a claim upon which relief can be granted.
We vacate this judgment and remand with instructions to
dismiss for lack of jurisdiction.  The Court of Interna-
tional Trade's judgment with respect to Counts 2, 3, and
6, however, is affirmed.  Indeed, while the court dismissed

---

[8]  The Government represented at oral argument
that if Plaintiffs had called Customs for information on
various liquidations, Customs would likely have provided
information.  Oral Arg. at 25:00-25:25, available at
http://www.cafc.uscourts.gov/oral-argument-
recordings/2011-1040/all.

these claims on grounds other than those relied on in this opinion, its final judgment of dismissal was for lack of subject matter jurisdiction; the same result compelled by our conclusion.

Additionally, as explained above, the claims asserted against the Government must be dismissed. Because we agree with the Court of International Trade's conclusion that Plaintiffs fail to qualify as intended third-party beneficiaries, we affirm the dismissal of Counts 1, 2, and 6. We also affirm the court's dismissal of Counts 8-10 and 12-15.[9] Regarding Count 11, the Court of International Trade dismissed this claim on the merits even though it was unreviewable under *Heckler*, 470 U.S. at 821. Therefore, we vacate this judgment and remand with instructions to dismiss for lack of jurisdiction.

Finally, we affirm the Court of International Trade's decision to deny Plaintiffs' motion for jurisdictional discovery.

**AFFIRMED-IN-PART AND VACATED-IN-PART**

---

[9] While the trial court dismissed Counts 8 and 9 for lack of jurisdiction and we concluded that these claims must be dismissed under *Twombly*, an affirmance is still appropriate. *See Morrison*, 130 S.Ct. at 2877, 2888 (Supreme Court affirmed judgment dismissing claims for lack of subject matter jurisdiction despite finding that these claims must be dismissed under Fed. R. Civ. P. 12(b)(6) instead).