In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2724

MATTHEW THOMAS *et al.*, on their own behalf
   and that of all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

UBS AG,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11 C 4798—**John W. Darrah**, *Judge*.

ARGUED DECEMBER 7, 2012—DECIDED FEBRUARY 7, 2013

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The three appellants are the named plaintiffs in a class action suit that seeks damages from UBS, Switzerland's largest bank, which specializes in managing the assets of wealthy persons from all over the world. Federal jurisdiction is based on the alienage branch of the diversity jurisdiction.

The parties have not made clear the source or sources of the law applicable to the case. The plaintiffs advance a variety of common law claims without indicating the state or nation whose law gives rise to them. They mainly cite law from states in which the three plaintiffs reside (Arizona, California, and New York), but they also cite Illinois cases (without explaining why). When the parties to a diversity case do not mention what state's law applies, the court applies the law of the state in which the court is located. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). But these parties, by citing cases both from Illinois (which is that state) and from the three states in which a plaintiff resides, imply that the law of all four states applies. This is quadruply strange: The parties don't suggest that *all* the class members reside in those three or four states or that all the allegedly wrongful acts occurred in those states. They don't indicate whether there are relevant differences among the laws of the four states. They don't explain why the law of the state of a plaintiff's or unnamed class member's residence should control under applicable conflict of laws principles rather than, for example, the law of Switzerland, which is UBS's domicile and also the place in which UBS committed the complained of acts or omissions. And they don't discuss the possibility that federal common law may apply instead of state law because, as we'll see, the plaintiffs rely in part on a contract with the federal government.

The problem of choice of law created by a nationwide class action governed by laws of different states or other

jurisdictions is usually solved by the district court's certifying a different subclass for class members in each jurisdiction whose law differs in some relevant respect from that of the other jurisdictions in which members of the class reside or the allegedly unlawful acts were committed. The parties have not proposed that solution and anyway the case was dismissed on the merits before any class or subclasses were certified.

We're not at liberty to decide a diversity case on the basis of the "general common law." *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-01 (7th Cir. 1995); *Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 941 (7th Cir. 1982). The term denoted the common law principles created by federal judges for use in diversity cases—principles that might differ from the law that the various state courts would have applied to the same cases if litigated in state rather than federal courts. In the *Erie* case the Supreme Court held that to decide diversity cases on the basis of common law created by federal judges was an unconstitutional usurpation of state authority. "There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). But parties still are allowed to specify (within reason, see *Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir. 1982)) what law shall govern a lawsuit between them, and the specification can be implicit.

Many common law principles are the same, or materially the same, in many or even all U.S. states, and when a case turns on such a principle the parties will

often cite decisions articulating and applying it without worrying about which state the decisions come from, as in our recent case of *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 438 (7th Cir. 2012); to the same effect see *Phillips v. Audio Active Ltd*., 494 F.3d 378, 386 (2d Cir. 2007). In *Adams* the parties had implicitly agreed that "American law" would govern the interpretation of a forum selection clause in a contract that had been made in Mexico, but they did not specify a state's law to govern the issue—just American rather than Mexican law. This case is similar. And since there is no indication that the common law principles invoked by the parties vary across the states that might have jurisdiction of claims in the complaint or that federal law might govern instead of state law or Swiss law instead of American law, we'll not worry further about choice of law.

The district judge dismissed the suit on the merits without, as we said, first considering whether to certify a class. Normally the issue of certification should be resolved first, *Thomas v. City of Peoria*, 580 F.3d 633, 635 (7th Cir. 2009); *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 454-56 (7th Cir. 2007), because if a class is certified this sets the stage for a settlement and if certification is denied the suit is likely to be abandoned, as the stakes of the named plaintiffs usually are too small to justify the expense of suit, though that may not be true in this case. But deciding whether to certify a class can take a long time. Rule 23(c)(1)(A) requires that the decision be made at "an early practicable time," but early is often not practicable. So when as in this case the

suit can quickly be shown to be groundless, it may make sense for the district court to skip certification and proceed directly to the merits. *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995).

UBS opposed certification even though a defendant with a winning case has much to gain from it—the judgment for the defendant will be res judicata in any suit by a class member who had not opted out of the class, provided "that the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); see also *Hansberry v. Lee*, 311 U.S. 32, 45 (1940). But even a defendant with a winning case may not have much to gain, if an opt out can be expected to file another class action against the defendant. That possibility to one side, a very risk-averse defendant will oppose certification even in a weak case lest it lose the case (against the odds) and, because the case was litigated as a class action, be ordered to pay very heavy damages.

The plaintiffs, and the other members of the class—who number in the thousands—are American citizens who had bank accounts in UBS in 2008 when the UBS tax-evasion scandal (of which more shortly) broke. The accounts of the three plaintiffs were large—$500,000 to $2 million each. The plaintiffs had not disclosed the existence of the accounts on their federal income tax returns, as they were required to do by Form 1040, Schedule B, which on line 7a asked (the current version is materially the same): "At any time during [2002-2008]

did you have an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" They also did not disclose the income they earned in those accounts. Neither did they pay federal income tax on that income, though it was taxable. Eventually they 'fessed up and paid the taxes they owed plus interest on those taxes and a 20 percent penalty. They did this pursuant to an IRS amnesty program, adopted in the wake of the scandal, called the "Offshore Voluntary Disclosure Program." Internal Revenue Service, *2009 Offshore Voluntary Disclosure Program*, www.irs.gov/uac/2009-Offshore-Voluntary-Disclosure-Program, and *Disclosure: Questions and Answers*, www.irs.gov/uac/Voluntary-Disclosure:-Questions-and-Answers (both visited Jan. 31, 2013). The suit seeks to recover from UBS the penalties, interest, and other costs that the plaintiffs and the other members of the class incurred from their scrape with the IRS, plus the profits (in the hundreds of millions of dollars) they claim UBS made from the class as a result of the fraud and other wrongful acts that they allege UBS committed by inducing them to maintain their accounts with it.

The plaintiffs are tax cheats, and it is very odd, to say the least, for tax cheats to seek to recover their penalties (let alone interest, which might simply compensate the IRS for the time value of money rightfully belonging to it rather than to the taxpayers) from the source, in this case UBS, of the income concealed from the IRS. One might have expected the plaintiffs to try to show that

they had forgotten they had accounts with UBS (though that would be preposterous, for these were significant investments for each of the plaintiffs). Or that UBS had told them that income earned in those accounts was somehow tax exempt and moreover that the accounts themselves were somehow not foreign bank accounts within the meaning of the tax code and so the plaintiffs didn't have to acknowledge having accounts with UBS. They don't make any of these feeble arguments. They do argue, as we'll see, that UBS was obligated to give them accurate tax advice and failed to do so, but not that it gave them inaccurate, as distinct from no, advice.

There are grounds for avoiding penalties for admitted violations of federal tax law, see, e.g., 26 U.S.C. § 6664(c), (d); 31 U.S.C § 5321(5)(B)(ii), such as reliance on plausible advice from a reputable-seeming lawyer or accountant. *United States v. Boyle*, 469 U.S. 241, 250-52 (1985); *Mulcahy, Pauritsch, Salvador & Co., Ltd. v. Commissioner*, 680 F.3d 867, 872 (7th Cir. 2012); *Kim v. Commissioner*, 679 F.3d 623, 626-27 (7th Cir. 2012); 14A *Mertens Law of Federal Income Taxation* § 55:89 (2012). But the plaintiffs do not invoke any of those grounds or argue that they asked UBS to advise them on U.S. tax law or that the bank volunteered such advice.

What's true is that in 2009 UBS admitted having helped tens of thousands of its clients to evade U.S. income taxes, and paid a $780 million fine. (That was the scandal we referred to; it is separate from the LIBOR scandal in which UBS has been involved recently.) Maybe this help included tax advice, but our plaintiffs

do not argue that they (or other members of the class) received tax advice from UBS. They argue rather that the bank should have prevented them from violating the law. This is like suing one's parents to recover tax penalties one has paid, on the ground that the parents had failed to bring one up to be an honest person who would not evade taxes and so would not subject himself to penalties.

There is in general no common law duty to prevent another person from violating the law. At worst, UBS, as we're about to see, violated an agreement with the IRS designed to prevent the kind of evasion that the plaintiffs engaged in. That might conceivably make UBS an aider or abettor of the plaintiffs's tax evasion and so make this case a distant relative to *Everet v. Williams* (Ex. 1725), better known as *The Highwayman's Case* and eventually reported under that name in 9 *L.Q. Rev.* 197 (1893). A highwayman had sued his partner in crime for an accounting of the illegal profits of their criminal activity. The court refused to adjudicate the case, and both parties were hanged. Minus the hanging and with certain exceptions (such as contribution and indemnity) irrelevant to this case, the principle enunciated in *The Highwayman's Case* applies to accomplices in civil wrongdoing, as noted in our recent decision in *Schlueter v. Latek*, 683 F.3d 350, 355-56 (7th Cir. 2012). In *The Highwayman's Case* one accomplice was seeking a bigger share of the profit from the crime from the other one; here one accomplice is seeking a smaller share of the costs of the crime from the other one. The principle is the same; the law leaves the quarreling accomplices where it finds them.

In 2001 UBS had signed a contract with the Internal Revenue Service in which it agreed to participate in the IRS's Qualified Intermediary Program, 26 U.S.C. § 1441; 26 C.F.R. § 1.1441-1(e)(5), a program designed to encourage foreign banks to help the IRS collect income tax on income earned by American taxpayers abroad. Among other things the program required participating banks to report to the IRS tax information about depositors who were U.S. taxpayers and to withhold "U.S.-source income," such as income on securities of American companies, and pay it over to the IRS. Two of the three named plaintiffs claim that the bank told them not to hold U.S. securities in their accounts. Had they obeyed the instructions they would not have earned any US-source income, but the bank would still have had to report to the IRS tax information about them if it knew or should have known that they were U.S. taxpayers. See Internal Revenue Service, *Qualified Intermediary Frequently Asked Questions*, www.irs.gov/Businesses/International-Businesses/Qualified-Intermediary-Frequently-Asked-Questions#2 (visited Jan. 31, 2013). The third plaintiff has not disclosed what was in his account.

Supposing the bank failed to comply with the reporting requirements in its agreement with the IRS with respect to any of the plaintiffs (or unnamed class members)—so what? The plaintiffs argue that they are third-party beneficiaries of the agreement and so entitled to enforce it and thus to obtain damages for the breach by UBS, assuming there was a breach. Their theory is that had UBS complied with its reporting requirements they would have known they had to pay taxes on earnings

in their accounts at the bank—known because the program required the bank to inform depositors what it was reporting to the IRS about their earnings on their deposits. The Supreme Court held recently that a government contract that involves no negotiable terms but merely brings the other party to the contract under a statute (or, we can assume, a regulation) does not confer third-party beneficiary status on anyone. *Astra USA, Inc. v. Santa Clara County*, 131 S.Ct. 1342, 1348 (2011). But there are negotiable terms in Qualified Intermediary agreements, so maybe (we needn't decide) the plaintiffs could be third-party beneficiaries: could be, but aren't.

A third-party beneficiary is someone whom the contracting parties *wanted* to have the right to enforce the contract. *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 219-20 (7th Cir. 1996); *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1056-59 (Fed. Cir. 2012); *Hess v. Ford Motor Co.*, 41 P.3d 46, 51 (Cal. 2002); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 211-13 (N.Y. 1985). It's unlikely that the IRS would want the tax cheats that the contract was intended to deter, by requiring foreign banks to report their income to it, to be able to shift the burden of the penalties that the IRS imposes on tax cheats to the foreign banks. True, that would increase the banks' incentives to comply with the contract. But offsetting this effect would be the reduction in the taxpayers' incentive to honor their tax obligations if they could shift the cost of cheating on their taxes to the foreign banks.

And what would UBS, the other party to the contract, gain from being made potentially liable to its depositors for failing to prevent them from evading taxes? Less than nothing. It's not surprising that there's no evidence or even suggestion of an intention by the parties to the Qualified Intermediary agreement to make the taxpayers third-party beneficiaries of it.

The plaintiffs have a second breach of contract claim: that they "entered into implied, oral and/or written contracts with UBS to provide [the plaintiffs] with professionally competent tax advice" and that the contracts contained "unreasonable and oppressive terms" and "are unenforceable and void due to lack of mutuality." Even before *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), such an allegation would have failed to state a claim because it doesn't provide the minimum information that the defendant would need in order to be able to answer the complaint. *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002); *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859-60 (7th Cir. 1999). The complaint does not tell the defendant what communications formed the basis of any of the supposed implied contracts and what their terms were.

The plaintiffs also charge fraud: that the bank inveigled them into continuing to invest with it (they had opened their accounts before the bank joined the Qualified Intermediary Program) by concealing its agreement with the IRS and the obligation entailed by the agreement to report tax information about the plaintiffs to the IRS.

This is a private-entrapment argument: by letting the plaintiffs think that keeping their money in foreign accounts would enable them to evade federal tax law successfully, UBS caused the plaintiffs to commit tax fraud. That is another frivolous theory of liability. For if it were adopted, not only would everyone have a legally enforceable duty to prevent crimes and other wrongs when he could; a failure to perform the duty would give the criminal or other wrongdoer a right of action against the failed protector.

The plaintiffs further argue that UBS touted the secrecy of their accounts, consistent with the Swiss tradition of secret bank accounts. The plaintiffs inferred that the bank would conceal their accounts not only from competitors, relatives, ex-spouses, private creditors, and journalists, but also from the Internal Revenue Service, thus enabling them to get away with not paying any federal income tax they might owe on the earnings in the accounts. But such a scheme would of course be illegal, bringing us back to *The Highwayman's Case*.

The plaintiffs also argue that UBS had a fiduciary obligation to them—the kind of duty that arises from a gross disparity in knowledge between the provider and the recipient of a service (a lawyer and a client, for example, or a physician and a patient) and requires that the provider treat the recipient as well as he would want himself treated. E.g., *Burdett v. Miller*, 957 F.2d 1375, 1381-82 (7th Cir. 1992); *In re Daisy Systems Corp.*, 97 F.3d 1171, 1177-79 (9th Cir. 1996). But a bank is not a fiduciary of its depositors. It is merely a creditor. *Bennice*

*v. Lakeshore Savings & Loan Ass'n*, 677 N.Y.S.2d 842, 843 (App. Div. 1998); *Copesky v. Superior Court*, 229 Cal. App. 3d 678, 689-94 (1991). It has no duty to treat them like children or illiterates, and thus remind them that they have to pay taxes on the income on their deposits. It has no duty to read aloud to them line 7a on Schedule B of Form 1040.

The plaintiffs further claim that UBS was unjustly enriched at their expense. But the claim again lacks the minimum specification that UBS would need to prepare an answer. No doubt the bank "enriched" itself by charging compensatory fees for its services to the plaintiffs, but where was the "injustice"? No injustices are alleged other than those alleged elsewhere in the complaint, which we've already discussed, making the unjust enrichment claim redundant. We explained in *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 957 (7th Cir. 2006), that the legal term "unjust enrichment" "has two referents, a remedial and a substantive. The remedial [referent] is to a situation in which a tort plaintiff asks not for the damages he has sustained but instead for the profit that the defendant obtained from the wrongful act." That has no relevance to this case, for the plaintiffs haven't gotten to first base in showing that UBS committed a tort against them.

"In its substantive sense, unjust enrichment or restitution refers primarily to situations in which either the defendant has received something that of rights belongs to the plaintiff (for example, he received it by mistake—or he stole it), or the plaintiff had rendered a service to

the defendant in circumstances in which one would reasonably expect to be paid (and the defendant refused to pay) though for a good reason there was no contract." *Id*. at 957-58. Neither of these examples relates to this case. See also *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012); *Murdock-Bryant Construction, Inc. v. Pearson*, 703 P.2d 1197, 1201-02 (Ariz. 1985).

We needn't discuss the plaintiffs' remaining claims—of negligence and malpractice—as they are frivolous squared. This lawsuit, including the appeal, is a travesty. We are surprised that UBS hasn't asked for the imposition of sanctions on the plaintiffs and class counsel.

AFFIRMED.