In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 14-2850

ILLINOIS LEAGUE OF ADVOCATES FOR THE DEVELOPMENTALLY
DISABLED, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ILLINOIS DEPARTMENT OF HUMAN SERVICES, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 13 C 1300 — **Marvin E. Aspen,** *Judge.*

_____

ARGUED SEPTEMBER 9, 2015 — DECIDED OCTOBER 15, 2015

_____

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. This lawsuit charges violations of 42 U.S.C. § 12132, a provision of Title II of the Americans with Disabilities Act which states that "no qualified individual with a disability shall, by reason of such disability, … be subjected to discrimination by any [public] entity," and of

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which has identical application to this case. See *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671–72 (7th Cir. 2012).

The suit was filed two years ago on behalf of the residents of Warren G. Murray Developmental Center, an SODC (state-operated developmental center). Located in Centralia, a small city in south-central Illinois, the Murray Center is one of seven SODCs in the state. Its residents (approximately 200 in number) are severely disabled, some having the mentality of an infant or toddler. Many not only are developmentally disabled but also have serious behavioral problems (often aggressive, or self-destructive as in the case of pica disorder—attempting to eat inedible objects).

The state's seven SODCs have in the aggregate about 1800 residents. A much larger number of persons (roughly 10,000) with severe developmental disabilities live in community-based (also called community-integrated) facilities, which are houses or apartments in residential settings that can accommodate between one and eight residents. The Division of Developmental Disabilities in the Illinois Department of Human Services provides services (such as housing and medical care) to approximately 25,000 developmentally disabled persons. Another 23,000 or so are on a waiting list to receive services, of whom 6000 are considered to be in emergency situations yet do not receive even essential services from the State of Illinois.

Since 2012 Illinois has been trying to shift the residents of the SODCs to community-based facilities, in accordance with a national trend—and a dramatic one, which has left Illinois a laggard outlier, with a higher number of SODC residents than any states except New Jersey and Texas. In 2013

Illinois had the second lowest percentage of developmentally disabled persons living in apartments that house six or fewer persons (Mississippi had the lowest percentage), while 13 states were no longer funding state-operated institutions designed to house 16 or more persons. David Braddock et al., *The State of the States in Intellectual and Developmental Disabilities: Emerging from the Great Recession* 21, 27, 31 (10th ed. 2015).

This trend that Illinois seeks to join reflects the financial distress of many states (of which Illinois may be the most distressed)—community-based facilities are cheaper than SODCs—but also a belief, supported both by evidence and by academic studies, that even persons who are severely disabled mentally or behaviorally or both do better in community-based facilities than in SODCs because they feel less isolated. The district judge in this case noted for example that "community programs are considered the best practice standard by the majority of professionals in the field. Community programs have been developing for at least 50 years and are not a fad" (citations omitted). The judge cited testimony that overall "people with intellectual disabilities do better in community programs." For illustrative academic studies that support these conclusions see Charlie Lakin et al., "Behavioral Outcomes of Deinstitutionalization for People with Intellectual and/or Developmental Disabilities: Third Decennial Review of U.S. Studies, 1977–2010," 21(2) *Policy Research Brief* 1 (2011); Roger J. Stancliffe et al., "Satisfaction and Sense of Well Being Among Medicaid ICF/MR and HCBS Recipients in Six States," 47 *J. Intellectual & Developmental Disabilities* 63 (2009); Marguerite Brown et al., *Eight Years Later: The Lives of People Who Moved from Institutions to Communities in California* (2001); Valerie J. Bradley et al., *Re-*

*sults of the Survey of Current and Former Belchertown Residents and Their Families: The Belchertown Follow-Project* (1992); Sheryl A. Larson & K. Charlie Lakin, "Deinstitutionalization of Persons with Mental Retardation: Behavior Outcomes," 14 *J. Association for Persons with Severe Handicaps* 324 (1989); James W. Conroy & Valerie J. Bradley, *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis* 48–65 (1985); see also U.S. Senate Comm. on Health, Education, Labor and Pensions, *Separate and Unequal: States Fail to Fulfill the Community Living Promises of the Americans with Disabilities Act* (2013); National Council on Disability, *Deinstitutionalization: Unfinished Business* (2012).

One reason the residents of community-based facilities do better, at least on average, is less crowding. Fewer than 20 percent of the Murray Center's residents have their own room, and some rooms house as many as four residents. A resident of a community-based facility is more likely to have his or her own room. Residents of community-based facilities also have readier access to stores, restaurants, movie theaters, parks, etc. than do residents of SODCs. They may be too disabled to visit any of these places by themselves, but they benefit emotionally from being able to go out into the community—expand their horizons, as it were—albeit under close supervision by nurses or other medical staff, rather than being isolated in a large medical center. To be "institutionalized," whether in a prison, a madhouse, or a "state-operated developmental center," is to be frozen out of society—a situation that even a severely developmentally disabled person can experience as deprivation. See *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999).

Not that community-based facilities are a panacea. The plaintiffs presented evidence that some community-based facilities have problems of short staffing and staff mistakes. But the record contains evidence of such problems at Murray and other SODCs, as well.

Early in 2012 Illinois launched a program to reduce the number of residents of SODCs by roughly a third. Two of the eight SODCs would be closed—and one of them was to be Murray. Scheduled to be closed in 2013, it remains open only because of this litigation. The other one scheduled to be closed, Jacksonville Developmental Center, has closed.

What will happen to the Murray residents when, as is bound to happen sooner or later, Murray is closed? Most will be placed in community-based facilities; those too disabled or otherwise unfit to reside in such facilities will be transferred to one of the remaining SODCs. Each current Murray resident is to be "assessed" for his or her suitability for community-based versus institutional residence. One goal of this lawsuit is to stop the assessment process. All residents of the Murray Center have a guardian (usually a relative of the resident), and a number of the guardians don't want their wards transferred to community-based facilities. They are the plaintiffs, and they moved the district judge to issue a preliminary injunction against the assessment and transfer of the plaintiffs' wards. The judge denied the motion, precipitating this appeal. 28 U.S.C. § 1292(a)(1). He noted that a resident will not be transferred to a community-based facility without his or her guardian's consent; and since Murray has not been closed, this means that any resident will continue, for the time being at any rate, to reside there if that is the guardian's wish. If and when Murray is

closed, other SODCs will remain and there will be places in them for those residents of the Murray Center whose guardians don't think them suited to reside in community-based facilities. There will be places for such wards because most residents of SODCs will be transferred to community-based facilities (that's the trend, remember), leaving room in the remaining SODCs for those few whose guardians don't think they are fit for community placement.

The plaintiffs say that residents of community-based facilities are treated worse on average than residents of institutional facilities. But they have not substantiated their claim by a systematic comparison of residents of the two types of facility. Cf. *Amundson ex rel. Amundson v. Wisconsin Dept. of Health Services*, 721 F.3d 871, 874–75 (7th Cir. 2013). Their claim is undermined, indeed vitiated, by their refusal to recognize a tradeoff between possibly better staff assistance in an institutional facility and the greater freedom—the closer approach to normality—of life in a community-based facility. They've also failed to substantiate their claim that their wards are mistreated relative to individuals with other types of disability. Remember that the plaintiffs have been granted veto power over the transfer of their wards to community-based facilities. True, they deny this, but the district court explained that while the plaintiffs "contend that DHS [the Illinois Department of Human Services] is forcing them to accept [community-based] placements as the only choice, stripping them of their right to consent to such placements[,] on the whole … the facts in the record—including uncontroverted written evidence—do not support a finding that Defendants are impeding or would impede Plaintiffs' right to consent to, *or reject*, community placement" (emphasis added). Their "right to reject" is properly regarded as in lieu of

*preliminary* relief—relief now even though the litigation is continuing in the district court. The guardians' veto power over the transfer of their wards to community-based facilities is a compelling ground for affirming the district court's denial of a preliminary injunction; with no danger of irreparable harm, which is to say harm that can't be prevented by the final judgment, there is no need or occasion for the issuance of a preliminary injunction.

We are mindful that as the population of the Murray Developmental Center shrinks in consequence of the decision of some (maybe many) guardians to permit their wards to be transferred to community-based facilities, a point will be reached at which the cost of operating the Center will exceed the benefits because there will be so few residents remaining. Keeping the Center open will then be like trying to maintain a 100-room hotel only one room of which is occupied. And so the Center will be closed and the remaining handful of residents transferred either to other SODCs or to community-based facilities. That will not be a *discriminatory* outcome. The handful not transferred until Murray closes will not be treated worse than residents transferred earlier. The plaintiffs concede that they have no right to their wards' being housed at Murray—that they would have no cause to complain were their wards to be transferred to another SODC that provided services equivalent to those provided by Murray.

There is more that is wrong with the appeal than the absence of any showing of discrimination. To obtain a preliminary injunction the movant must show not only that its denial will cause harm to him that a final judgment will not be able to rectify—in other words, as we noted earlier, that the

denial will cause irreparable harm—but also that this harm, discounted by the probability of the plaintiff's failing to obtain a favorable final judgment, will exceed the harm that the preliminary injunction would do to the defendant. See *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir. 1984). Let's pause on this second requirement for a moment. Suppose the plaintiff has a 60 percent chance of obtaining a favorable final judgment, and will suffer an irreparable harm of $1 million if his motion for a preliminary injunction is denied. There is therefore a 60 percent chance that if the preliminary injunction is granted he will justly be spared a $1 million loss, and so the injunction should be granted unless the defendant can show that he is at a higher risk of loss than the plaintiff if the injunction is granted. Suppose that if it's granted the defendant will lose $2 million. We know there's a 40 percent chance that the defendant is in the right (for remember that we are assuming that the plaintiff has a 60 percent chance of prevailing in the litigation). That means that if the preliminary injunction is granted he will suffer an expected unjust loss of $800,000 (40% of $2 million), which will exceed the plaintiff's parallel expected unjust loss if the preliminary injunction is denied, which is $600,000 (60% of $1 million). Therefore the preliminary injunction should be denied.

We don't have neat numbers in this case that would enable us to measure loss and probability, as in our hypothetical case. But we don't need them. The plaintiffs are seeking to enjoin the state from assessing the capacity of residents of the Murray Center to reside in community-based facilities in the absence of guardian consent to the assessment, and to prevent Murray from being closed during this litigation. If granted, the injunction would impose costs on the state, be-

cause the institutional facilities are more costly than the community-based ones, as we've said. In addition, unassessed residents of Murray could not be offered transfer to community-based facilities, for the purpose of the assessment is to determine what kind of facility the disabled person requires. (Whether a resident could be transferred to another SODC without an assessment is unclear.)

So even if a preliminary injunction were limited to enjoining assessment, it could prevent Murray from being closed though only a handful of residents remained, and though on average developmentally disabled persons assessed as being suitable for residence in a community-based facility would be better off if in such a facility than if they remained in an institution. So there would be costs to the state (the costs of continuing to operate Murray) if a preliminary injunction were granted, and these costs could not be recouped. But it doesn't seem that refusing to issue the injunction can impose costs on anyone, because the guardians (the plaintiffs) remain empowered to prevent their wards from being transferred to community-based facilities even if the "assessors" conclude that those wards would be better off in such facilities. The grant of the preliminary injunction sought by the plaintiffs would impose irreparable harm on the state, but, as we've seen, the denial of it would impose no irreparable harm on the plaintiffs, thus making the case against the injunction airtight.

The plaintiffs' refusal to allow their wards to be assessed during this litigation also collides with 42 U.S.C. § 1396n(c)(2)(B), which provides that a state accepting federal funds under section 1915(c) of the Social Security Act, which waives some limitations imposed by the Medicaid Act

on home and community-based provision of medical services, must "provide … for an evaluation of the need for inpatient hospital services." See also 59 Ill. Admin. Code § 120.80(a).

Yet the plaintiffs claim that the Medicaid Act entitles them to insist that their wards remain in an SODC. (Because neither party argues otherwise, we assume for purposes of this appeal that 42 U.S.C. § 1983 supplies a private right of action to enforce claims under the relevant provision of the Act, which is 42 U.S.C. § 1396n(c)(2)(C); cf. *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 456–58 (7th Cir. 2007).) The claim is academic, since as we've explained the guardians can (and this regardless of the Medicaid Act) insist that their wards remain in an SODC (though they cannot insist on a particular SODC). It is also meritless. The Act allows a state to provide community-based living arrangements to people who would otherwise be institutionalized if the state applies for and receives a waiver under the statutory provision that we cited earlier. See *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 601 (7th Cir. 2004). For the state to be eligible for the waiver, it must make sure that the individuals likely to need institutional care "are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." 42 U.S.C. § 1396n(c)(2)(C). The state must also have a plan for "allowing beneficiaries to choose either institutional services or home and community-based services." 42 C.F.R. § 441.303(d); see also *id.*, § 441.302(d). But choice is limited to "feasible" options "available" under the waiver. *Bertrand ex rel. Bertrand v. Maram*, *supra*, 495 F.3d at 459, explains that the statute does

not require a state to offer any particular option; it "just requires the provision of information about options that are available." Cf. *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 910–11 (7th Cir. 2003). The plaintiffs have presented no evidence that their wards would be denied the lawfully required level of care even if Illinois were to close *all* its SODCs.

The urgency required for emergency relief has not been shown. The denial of a preliminary injunction is therefore

AFFIRMED.